**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-1150**

---

TBL LICENSING, LLC,

         Plaintiff - Appellant,

      v.

KATHERINE K. VIDAL, in her official capacity as Director of the United States Patent & Trademark Office; UNITED STATES PATENT & TRADEMARK OFFICE,

         Defendants - Appellees.

------------------------------------

INTERNATIONAL TRADEMARK ASSOCIATION,

         Amicus Supporting Appellant.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Claude M. Hilton, Senior District Judge.  (1:21-cv-00681-CMH-IDD)

---

Argued:  January 24, 2024               Decided:  April 15, 2024

---

Before GREGORY, QUATTLEBAUM, and BENJAMIN, Circuit Judges.

---

Affirmed by published opinion.  Judge Quattlebaum wrote the opinion, in which Judge Gregory and Judge Benjamin joined.

---

**ARGUED:** Elizabeth D. Ferrill, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Washington, D.C., for Appellant. Christina J. Hieber, UNITED STATES PATENT AND TRADEMARK OFFICE, Alexandria, Virginia, for Appellee. **ON BRIEF:** Douglas A. Rettew, Naresh Kilaru, Troy V. Viger, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Washington, D.C., for Appellant. Thomas W. Krause, Solicitor, Benjamin T. Hickman, Associate Solicitor, Office of the Solicitor, UNITED STATES PATENT AND TRADEMARK OFFICE, Alexandria, Virginia; Jessica D. Aber, United States Attorney, Richmond, Virginia, Yuri S. Fuchs, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellees. Jonathan E. Moskin, FOLEY & LARDNER LLP, New York, New York; A. Justin Ourso III, OURSO COUNSELS, L.L.C., Baton Rouge, Louisiana; Jack A. Wheat, MCBRAYER PLLC, Louisville, Kentucky, for Amicus Curiae.

---

QUATTLEBAUM, Circuit Judge:

TBL Licensing, LLC, more commonly known as Timberland, tried to register certain features from the design of its popular boot under the Lanham Act as trade dress. But the law prohibits the registration of product designs that have not acquired a distinctive meaning identifying the product with its maker in the minds of the consuming public. *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28–29 (2001). It also bars the registration of product designs that are functional since protection of functionality is reserved for patent law. *Id*. at 29. Concluding the boot design is not distinctive, the United States Patent and Trademark Office ("USPTO") refused to register it. TBL turned to federal district court, which agreed with the USPTO that the boot design is not distinctive and added that it is impermissibly functional. On either independent ground, the district court granted the USPTO's motion for summary judgment. On distinctiveness, the issue we face is not whether the public recognizes the entire product as Timberland's perhaps iconic boot; rather, we must decide whether the district court reversibly erred in concluding that the subset of design features that TBL selectively sought to register lacks distinctiveness in the public's view. We hold that the district court did not reversibly err. So, without deciding functionality, we affirm the district court's grant of summary judgment for the USPTO.

## I.

### A.

Generally, trademark law protects marks that distinguish the products of one maker from those of another. *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142

(2015). The first to use the distinctive mark acquires rights to that mark, including the right to prevent others from using it. *Id.* Though being the first to use a mark is enough to generate trademark protection, federal law provides various mechanisms that augment that protection. *Id.* Relevant here, the Lanham Act confers various legal rights to trademark owners who register their marks. *Id.*[1]

Trademark law is commonly known to protect words, for example, "Nike," and symbols, like Nike's "swoosh." *See Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000). But it also can cover product designs. In fact, the Lanham Act defines "trademark" broadly to include "any word, name, symbol, or device, or any combination thereof" that is used or intended to be used "to identify and distinguish" the sources of different goods. 15 U.S.C. § 1127. "Since human beings might use as a 'symbol' or 'device' almost anything at all that is capable of carrying meaning," a product's design can be registered and protected under federal law as trade dress, a type of trademark. *Wal-Mart Stores*, 529 U.S. at 209–10 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162 (1995)); *see also TrafFix*, 532 U.S. at 28 ("It is well established that trade dress can be protected under federal law."); 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:7 (5th ed. 2022) ("Today, it is clear that 'trade dress' can quality

---

[1] For instance, registration provides "constructive notice of the registrant's claim of ownership" of the mark. 15 U.S.C. § 1072. Registration also serves as "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate." *Id.* § 1057(b). Also, once a mark has been registered for five years, it can become "incontestable." *Id.* §§ 1065, 1115(b).

[sic] as a type of 'trademark' and be registered and protected as a 'trademark.'"). Examples of product designs treated as trade dress include Coca-Cola's hourglass-shaped bottle, *see Qualitex*, 514 U.S. at 162*, the dripping red wax seal on a bottle of Maker's Mark, *see Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410 (6th Cir. 2012), and the fish-shape of Goldfish crackers, *see Nabisco, Inc. v. PF Brands, Inc.*, 50 F. Supp. 2d 188 (S.D.N.Y. 1999).

But not all product designs can receive trade dress protection. *See TrafFix*, 532 U.S. at 29 ("Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products."). Trademark law does not protect product designs that are functional as whole. *Id.*[2] Nor does it protect product designs that lack distinctive meaning as a source identifier. *Wal-Mart Stores*, 529 U.S. at 210. The same principles apply for purposes of registration under trademark law. *See id.*; 15 U.S.C. § 1052(e)(5).

Whether a word, logo or design, to register a mark and obtain the benefits that follow, the mark's owner must file an application with the USPTO. 15 U.S.C. § 1051. That application must include, among other things, "a drawing of the mark." *Id.* § 1051(a)(2); *see also* 37 C.F.R. § 2.51. Per USPTO regulations, an application to register a product

---

[2] That is not to say that intellectual property rights never inhere in functional designs. But protecting functional designs is the province of patents, not trademarks. Patent law "encourage[s] invention by granting inventors a monopoly over new product designs or functions for a limited time," while trademark law "seeks to promote competition by protecting a firm's reputation." *Qualitex*, 514 U.S. at 164–65; *see also CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 656–57 (4th Cir. 2020). What function gives in the realm of patents, it takes away in the domain of trade dress.

design must also include a written description of the design. *See* 37 C.F.R. § 2.37. Both the drawing and description define the mark that the applicant intends to register. *See id.* ("A description of the mark must be included if the mark is not in standard characters."); *id.* § 2.52 ("A drawing depicts the mark sought to be registered."); *see also* USPTO, U.S. Dep't of Commerce, *Trademark Manual of Examining Procedure* § 1202.02(c) (Jan. 2015), available at https://tmep.uspto.gov/RDMS/TMEP/Jan2015 [https://perma.cc/XKN2-VRAU] ("To ensure proper examination, the drawing and description of such a mark must accurately depict the mark the applicant intends to register.");[3] 1 *McCarthy* § 8:7 ("To be registerable as a trademark or service mark, the elements of the trade dress must be listed and defined so that the public will know the exact parameters of the claimed exclusive right covered by the registration.").

After an application has been filed, the USPTO review process begins with an examining attorney. If the applicant is dissatisfied with the examining attorney's decision, it can appeal to the USPTO's Trademark Trial and Appeal Board ("TTAB"). And if still dissatisfied, the Lanham Act permits an applicant to challenge a TTAB decision in district court. *See* 15 U.S.C. § 1071(b). Considered a new proceeding, an action under § 1071(b) allows for "additional development of the record and de novo review." *Snyder's-Lance, Inc. v. Frito-Lay N. Am., Inc.*, 991 F.3d 512, 515 (4th Cir. 2021); *see also B & B Hardware*,

---

[3] We refer to the version of the Trademark Manual of Examining Procedure in effect at the time TBL applied for registration, May 2015. That said, even if we were to refer instead to the manual's most recent version, the key language would remain the same. *See* USPTO, U.S. Dep't of Commerce, *Trademark Manual of Examining Procedure* § 1202.02(c) (Nov. 2023), available at https://tmep.uspto.gov/RDMS/TMEP/current [https://perma.cc/49JF-673J].

575 U.S. at 144 ("In district court, the parties can conduct additional discovery and the judge resolves registration *de novo*.").

B.

For decades, TBL has sold the following boot in several colors:



J.A. 28–29.

In May 2015, TBL applied to register aspects of the boot's design as protected trade dress with the USPTO. As required by law, *see* 37 C.F.R. § 2.37, TBL included a written description "specify[ing] which elements . . . constitute the mark and are claimed as part of the mark and which are not." *Trademark Manual of Examining Procedure* § 1202.02(c)(ii).

> The mark consists of a three-dimensional configuration of a lace-up boot having an overall shape and silhouette as depicted in the drawings, with a visibly bulbous toe box and the following individual features:
>
> (1) the external appearance of a tube-shaped ankle collar on the outside surface of the product running from one eyelet panel to the other eyelet panel around the sides and rear of the boot and protruding over the upper side and rear panels of the boot (material on the inside of the ankle collar not being claimed);

7

(2) outsoles having two color tones divided horizontally and extending around the circumference of the boot, and visibly showing inverted tooth shaped cuts on each side of the heel of the outsole and around the sides and front of the forward portion of the outsole;

(3) an hourglass-shaped rear heel panel, defined by four vertical stitching lines from the top of the outsole to the rear collar;

(4) quad-stitching forming an inverted "U" shape around the vamp line in front of the boot at the bottom of the tongue and curving around to the left and right sides and ending at the cinched portion of the hourglass stitching of the rear heel panel; and

(5) eyelets shaped hexagonally on the exterior-facing outside surface.

The double row stitching around the rear and side ankle collar, the single stitching around the upper two eyelets on each side, the single stitching along the upper perimeter of the shaft in front of the eyelets and the boot tongue, the appearance of the eyelets on the boot interior, the top of the ankle collar, the bottom, outer most surface of the outsole, and the uppermost surface of the outsole connecting to the boot around the perimeter, all of which are depicted in broken or dotted lines, are not being claimed as part of the mark and serve only to show the position or placement of the mark.

J.A. 253–54 (paragraph breaks added).

Also as required by law, *see* 15 U.S.C. § 1051(a)(2); 37 C.F.R. § 2.51, TBL included this drawing of the design features it sought to register:



J.A. 246. For clarity, we have added the numbers on the drawing, which correspond to the design features described in the application.

Importantly, TBL did not try to register every aspect of the boot. In its registration application, TBL asserted—or, to use the legal term, "claimed"—intellectual property rights in some, but not all, of the features of its boot design. For instance, as a part of the design it sought to register, TBL claimed "the external appearance of a tube-shaped ankle collar on the outside surface of the product" but not "material on the inside of the ankle collar." J.A. 253. Likewise, it claimed two-colored outsoles "visibly showing inverted tooth shaped cuts" along the soles' sides, but not "the bottom, outer most surface of the

outsole." J.A. 253–54. Also, the application claimed no particular color as a part of the boot's design, such as the popular wheat-yellow color depicted above. Nor did it include TBL's already-registered tree logo or TIMBERLAND word mark.[4]

The USPTO's examining attorney refused to register the design, finding it overall functional and not distinctive. TBL appealed to TTAB, which affirmed the examining attorney's refusal to register the design, finding the design lacks distinctiveness and declining to reach whether it is functional.

As allowed by the Lanham Act, TBL challenged TTAB's decision in federal district court, naming as defendants the USPTO and its then-acting director (collectively "USPTO"). After discovery, the parties agreed to allow the district court to "resolve any factual disputes without the need for a trial." J.A. 32–40. Having so agreed, TBL and the USPTO then cross-moved for summary judgment. So, in effect, the district court conducted a bench trial. *See, e.g.*, *Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 354 (4th Cir. 1983).

The district court held that TBL could not register the design described in its application for two independent reasons. First, the district court found the design functional. Second, it found that the design, as described, has not acquired a distinctive meaning identifying the boots as Timberlands. On either ground, the district court granted

---

[4] TBL's decision to limit the design features of the boot in its application was quite possibly strategic. Had it included, for instance, the inner ankle collar or the lug sole, the overall risk of a functionality finding likely would have increased. But having omitted these features in its application, TBL must prove that, without resorting to these unclaimed features, the public associates the features TBL did claim exclusively with Timberland.

the USPTO's motion for summary judgment, denied TBL's cross-motion and dismissed the case. TBL timely appealed that final decision, which falls within our appellate jurisdiction. *See* 28 U.S.C. § 1291.

## II.

## A.

Since the parties jointly authorized the district court to resolve factual disputes before cross-moving for summary judgment—effectively asking the district court to conduct a bench trial—we review the district court's factual findings for clear error. *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 329 F.3d 359, 362–63 (4th Cir. 2003). Functionality is a question of fact. *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020). So is distinctiveness. *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 525–26 (4th Cir. 2002). Such factual findings are clearly erroneous only if there is no evidence in the record to support them or if, upon our own review of the record, we are "left with a definite and firm conviction that a mistake has been made." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1526 (4th Cir. 1984). Despite the deference it accords district courts as factfinders, clear error review does not insulate findings resulting from a misapplication of the law. *Id.* Rather, the district court's legal determinations are reviewed de novo. *Int'l Bancorp*, 329 F.3d at 362.

Here, we must affirm the district court unless it reversibly erred in finding both that the design TBL claimed is functional and that the same design is not distinctive. In assessing both issues, we focus on the design drawn and described in TBL's application.

*See* 37 C.F.R. § 2.37 ("A description of the mark must be included if the mark is not in standard characters."); *id.* § 2.52 ("A drawing depicts the mark sought to be registered."); *see, e.g.*, *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 259 (3d Cir. 2021) ("To decide whether a trade dress is functional, we look at the usefulness of the exact feature or set of features claimed by the trade dress."); *see also Trademark Manual of Examining Procedure* § 1202.02(c) ("To ensure proper examination, the drawing and description of such a mark must accurately depict the mark the applicant intends to register."); 1 *McCarthy* § 8:7 ("To be registerable as a trademark or service mark, the elements of the trade dress must be listed and defined so that the public will know the exact parameters of the claimed exclusive right covered by the registration."). Crucial to this appeal, that means we consider only the outer ankle collar, the two-tone color and etching on the side of the boot's sole, the hourglass rear heel panel, the quad stitching along the boot's side and tongue area, the hexagonal eyelets for the boot's laces and the boot's bulbous toe box. Other design features of the boot—such as the popular wheat-yellow color, the tree logo, the lug soles and the inner ankle collar—cannot be used to prove distinctiveness, as they are not design features that TBL claimed in its application.

## B.

Beginning with functionality, a product design cannot be registered as a trade dress if it "comprises any matter that, as a whole, is functional." 15 U.S.C. § 1052(e)(5). As the party seeking to register its design, TBL bore the burden of proving that the design it sought to register is not functional. *TrafFix*, 532 U.S. at 32. A feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id.*

(quoting *Qualitex*, 514 U.S. at 165 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982))).[5] More simply, a feature is functional if "it is the reason the device works." *Id.* at 34. In *TrafFix*, the Supreme Court found functional a "dual-spring design" for preventing outdoor signs from toppling in windy conditions. *Id.* at 25, 33. In other cases, courts of appeals have found various product designs functional. *See, e.g.*, *CTB*, 954 F.3d 647 (chicken feeder's color and shape); *Ezaki Glico Kabushiki Kaisha*, 986 F.3d 250 (chocolate-covered cookie stick); *Leatherman Tool Grp., Inc., v. Cooper Indus., Inc.*, 199 F.3d 1009 (9th Cir. 1999) (multi-function pocket tool); *Apple, Inc. v. Samsung Elecs. Co.*, 786 F.3d 983 (Fed. Cir. 2015) (smartphone's shape), *rev'd in part on other grounds*, 580 U.S. 53 (2016).

Our circuit looks to four factors to assess functionality: "(1) the existence of utility patents disclosing the utilitarian advantages of a design; (2) advertising focusing on the utilitarian advantages of a design; (3) the availability of functionally equivalent alternative designs which competitors may use; and (4) facts indicating that a design results in a comparatively simple or cheap method of manufacturing the product." *CTB*, 954 F.3d at 657–58.

The district court split the applied-for design into eight elements: "collar, two-tone sole, lug soles, hourglass heel counter, quad stitching, shape of the vamp stitching,

---

[5] Alternatively, even if a feature is not functional under that traditional definition, it can still be functional if excluding others from using it "would put competitors at a significant non-reputation-related disadvantage." *TrafFix*, 532 U.S. at 32 (quoting *Qualitex*, 514 U.S. at 165). "This test applies to the question of whether granting protection to an aesthetic design feature 'would significantly hinder competition.'" *CTB*, 954 F.3d at 657 n.5 (quoting *Qualitex*, 514 U.S. at 170). Neither party has invoked this alternative test.

hexagonal eyelets, and bulbous toe box." *TBL Licensing, LLC v. Vidal*, 644 F. Supp. 3d 190, 194 (E.D. Va. 2022). Focusing on only the first two of the four functionality factors, the district court pointed to utility patents and advertisements that it determined described the functional benefits of each element in turn. Then combining the elements, the district court wrote:

> The features of the applied-for boot design *as a whole* do what these features are supposed to do in any good boot: they make it comfortable, they make it durable, they make it waterproof, and they make it suitable for its intended uses, including hiking through a variety of environments and pursuing some work projects for which toe protection is needed.

*Id.* at 199 (emphasis added). With that, the district court concluded that the boot design is functional.

TBL takes issue with that finding on two grounds. First, TBL argues that, despite the district court's concluding comments about the "applied-for boot design as a whole," *id.*, the court failed to meaningfully consider the design "as a whole," as required by law. 15 U.S.C. § 1052(e)(5); *see CTB*, 954 F.3d at 665. Second, even if the district ultimately analyzed the design as a whole, TBL contends that it erred in skipping the third and fourth functionality factors. However, a sufficiently strong showing on the first two factors—utility patents and advertising—compels a finding of functionality, without requiring a court to delve into the remaining factors. *See TrafFix*, 532 U.S. at 33–34 (finding "no need" to assess alternative designs where it was clear from the utility patents that the design at issue was functional); *CTB*, 954 F.3d at 659–60, 662–64 (deciding that a design was functional based solely on the first two factors). Acknowledging this legal framework, TBL argues that the district court misconstrued the features TBL sought to register in its

application such that the court relied on inapposite patents and advertisements that did not provide evidence of functionality sufficiently strong to decide the case.

But even if we assume, without deciding, that the district court failed to analyze the design as a whole or improperly strayed from the design TBL drew and described in its application, the district court did not clearly err in finding that the limited design TBL sought to register, as defined in its application, has not acquired a distinctive meaning leading consumers to associate the design with TBL. On that ground alone, the applied-for design could not be registered as trade dress. We now turn to that dispositive ground.

C.

To be registrable, a mark must cause the public to identify the product bearing it as coming from a specific source. *Wal-Mart Stores*, 529 U.S. at 210. That is, the mark must be distinctive. *Id.* A mark generally acquires distinctiveness "if it has developed secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" *Id.* at 211 (quoting *Inwood Labs.*, 456 U.S. at 851 n.11); *see also U.S. Search*, 300 F.3d at 525 (defining secondary meaning as "the consuming public's understanding that the mark, when used in context, refers not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify" (quoting *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990)).[6] While the public "need not be able to

---

[6] A mark could also be inherently distinctive when its "intrinsic nature serves to identify a particular source." *Wal-Mart Stores*, 529 U.S. at 210 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). But, in product design cases, the Supreme

identify the name of the manufacturer that produces the product," it must perceive "that the product emanates from a single source." *Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 660 (4th Cir. 1996) (quoting *M. Kramer Mfg. v. Andrews*, 783 F.2d 421, 449 (4th Cir. 1986)); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 766 n.4 (1992) ("Secondary meaning is used generally to indicate that a mark or dress has come through use to be uniquely associated with a specific source." (internal quotation omitted)). That public perception must rely on the features claimed, as drawn and described in TBL's application.

This point is critical. Some consumers might recognize the whole boot, unclaimed features and all, as a Timberland. But TBL did not undertake to register the entire boot. Instead, TBL sought to register only the select attributes described in its application—for instance, two-colored outsoles "visibly showing inverted tooth shaped cuts" along the soles' sides, but not "the bottom, outer most surface of the outsole." J.A. 253–54. Just as TBL effectively narrowed the functionality inquiry by tailoring its application to select elements of its boot design, so too must we limit our secondary meaning analysis to those applied-for features. Thus, the question is whether the design features claimed in TBL's application have acquired secondary meaning. And those features have not if consumers associate them with sources other than just Timberland. *See Two Pesos*, 505 U.S. at 766 n.4; *Tools USA*, 87 F.3d at 660; *Perini*, 915 F.2d at 125.

---

Court has all but closed the door on inherent distinctiveness because consumers typically consider product designs as "render[ing] the product itself more useful or more appealing" rather than "identify[ing] the source." *See id.* at 212–16; *see also* 1 *McCarthy* § 7:94.

A party seeking to establish secondary meaning in a product design bears a "formidable burden of proof." 1 *McCarthy* § 8:8.50; *see also U.S. Search*, 300 F.3d at 525–26. Reflecting that "rigorous evidentiary standard," our circuit assesses secondary meaning through many factors: (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) record of sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use. *U.S. Search*, 300 F.3d at 525 (citing *Perini*, 915 F.2d at 125). "[N]o single factor is determinative." *Id.*

Applying these factors, the district court found that TBL failed to carry its formidable burden of proving that the design features of the boot that it sought to register have acquired secondary meaning. And, as described below, the district court did not clearly err in reaching that finding.

### 1. Consumer Studies

We start with consumer studies, or surveys, due to their importance in the secondary meaning analysis. "Survey evidence is generally thought to be the most direct and persuasive way of establishing secondary meaning." *Id.* at 526 n.13. Indeed, TBL hired a survey expert in its effort to show that consumers associate the claimed features of its boot's design with Timberland. But the district court pointed out several flaws with the survey.

First, the survey, according to the district court, improperly suggested an outcome. The uncolored and unshaded drawing in TBL's application "depicts the mark sought to be registered." 37 C.F.R. § 2.52. But, instead of using that drawing, the survey used grayscale

photographs of the boots. While those photographs depicted boots that were light in color, the grayscale photographs of the non-Timberland boots used as control images appeared darker.

The district court concluded that the grayscale photographs of the light-colored boots suggested to the survey respondents that the boot presented to them was a Timberland boot depicted in its best-selling wheat-yellow color. While the boot is now offered in multiple colors, the boot has been sold in a wheat-yellow color from the beginning. In fact, TBL previously applied to register that color but was ultimately unsuccessful. In its present application, the one on which our present analysis must focus, TBL has not claimed the wheat-yellow color or any other. So, the district court found that the survey used features of the boot's design that were not part of the application to improperly suggest the boot was a Timberland.

Second, the district court determined that the survey used a problematic progression. The survey began by asking, "Do you associate this boot design with any company or companies?" J.A. 328–29. Then, it asked, "What company?" J.A. 328–29. The district court worried that this progression may have nudged respondents to name only a single company, even if the respondents associated the boot with several. Such a nudge would matter because if the public associated the claimed design features with more than just Timberland, the design did not acquire a distinctive secondary meaning. *See Two Pesos*, 505 U.S. at 766 n.4; *Tools USA*, 87 F.3d at 660; *Perini*, 915 F.2d at 125.

TBL has not challenged the district court's critique. In fact, it affirmatively waived any challenge to the district court's findings regarding the weight, or lack thereof, of the

survey TBL proffered. Without "this most direct and persuasive" evidence of secondary meaning from consumers, TBL must resort to circumstantial evidence. *U.S. Search*, 300 F.3d at 526 n.13.

## 2. *Advertising Expenditures*

TBL did, however, challenge the district court's ruling on advertising expenditures, arguing it clearly erred in not giving such expenditures more weight. No doubt, TBL has spent vast sums on advertising. According to the declaration of a senior Timberland manager, TBL has spent over $81 million marketing the boot in the U.S. across various media over the past six years. But the district court declined to infer secondary meaning from advertisements merely picturing Timberland boots. It emphasized TBL's failure to point to advertisements encouraging consumers to identify the boots as Timberlands by looking for the specific design features TBL sought to register.

Expenditures themselves do not, from a legal standpoint, establish secondary meaning without a showing that they translated into what counts—consumers associating the claimed design features with a single source. *See, e.g.*, *B & J Enters., Ltd. v. Giordano*, 329 F. App'x 411, 419 (4th Cir. 2009) (argued but unpublished) ("Absent a showing that such expenditures 'were effective in causing the relevant group of consumers to associate the mark with itself,' secondary meaning cannot be established." (quoting *FM 103.1, Inc. v. Universal Broad. of N.Y., Inc.*, 929 F. Supp. 187, 196 (D.N.J. 1996))); *Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.*, 188 F.3d 501, *7 (4th Cir. 1999) (unpublished table decision) (discounting advertising expenditures since the company alleging trade name infringement "failed to show that its expenditures were effective in

19

causing consumers in the . . . geographic area to associate the trade name . . . with [its] business"); *see also* 2 *McCarthy* § 15:51 ("[T]he mere expenditure of money is not, in itself, determinative of the actual result in buyers' minds.").

Accordingly, not all advertisements are equally probative of secondary meaning. Advertisements that direct consumers to "look for" features claimed as trade dress to identify the advertiser's product provide particularly powerful evidence that those features have acquired secondary meaning. *See* 1 *McCarthy* § 8:8.50 (stating that sometimes look-for advertising is "the only practical way to develop secondary meaning in trade dress"); *id.* § 15:52 ("The use of 'look for' advertising of a nonverbal designation like a package design can be persuasive evidence that this design drew consumers' attention so that they used it to identify the source of the goods."); *see also Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662 (7th Cir. 1995) ("Advertising that touts a product feature for its desirable qualities and not primarily as a way to distinguish the producer's brand is not only not evidence that the feature has acquired secondary meaning, it directly undermines such a finding."). The Maker's Mark red wax seal illustrates this principle. In *Maker's Mark*, the Sixth Circuit affirmed the district court's finding that "Maker's Mark usually focus[ed] directly on the red dripping wax seal." *Maker's Mark*, 679 F.3d at 421. It explained that "the district court had before it, and considered, an abundance of Maker's Mark advertisements that specifically feature the red dripping wax seal." *Id.*

On the other hand, advertising proves less if it does not somehow spotlight the claimed design features over other unclaimed attributes. *See Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1254 (10th Cir. 2016) ("[A]dvertising alone is typically unhelpful

to prove secondary meaning when it is not directed at highlighting the trade dress."); *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 871 (8th Cir. 1994) ("The advertisements submitted with the application cannot establish secondary meaning because they do not separate the claimed dress of the products from the other marks that serve to identify the products as those of Aromatique."); *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009) ("To demonstrate secondary meaning based on advertising, the advertising must be of a 'nature and extent to create an association' [of the trade dress] with the advertiser's goods." (quoting *Dep't of Parks & Recreation v. Bazaar Del Mundo*, 448 F.3d 1118, 1128 (9th Cir. 2006))).

This makes sense. If advertising calls no special attention to the features of the product's design claimed to have secondary meaning, such evidence generally carries less weight. Even so, less talk may be required to showcase to consumers a product's more prominent features, which to an extent speak for themselves. *See, e.g.*, *Nabisco*, 50 F. Supp. 2d at 200 ("The Goldfish shape, the most salient feature of the product design, dominates these advertisements."); *id.* at 204 ("The print advertisements call attention to the product configuration, prominently displaying the Goldfish form.").

The district court followed these principles. Looking beyond the mere expenditures, it explained that the advertisements TBL introduced depicted the entire boot. Those pictures, for example, included the wheat-yellow color and Timberland's tree logo, even though those features are not claimed in its current trade dress application. Compared to

those unclaimed, but perhaps more conspicuous, features of the boot,[7] the advertisements did not call attention to the design features in the application—like the hexagonal shape of the eyelets or the fourth row of stitching, to name two examples. As a result, the district court did not clearly err in its analysis of this factor.

### 3. Sales Success

TBL similarly argues that the district court's analysis of the boot's sales success was clearly erroneous. Without a doubt, the Timberland boot has enjoyed commercial success. According to the same declaration setting forth TBL's advertising expenditures, the boot has brought in over a billion dollars in sales from 2013 through 2021, averaging well over $100 million per year. However, the district court did not lend these sales much weight without any evidence showing why customers bought the boots. The district court reasoned that sales would suggest secondary meaning only if customers bought the boots because they associated the claimed design features with Timberland. But, the district court emphasized, TBL had not produced evidence that customers bought its boots because they attributed to Timberland the features TBL sought to register—the outer ankle collar, the two-tone color and etching on the side of the boot's sole, the hourglass rear heel panel, the quad stitching on the boot's side and tongue area, the hexagonal eyelets for the boot's laces and the bulbous toe box. As the district court observed, customers could just as well have bought the boots because they liked how those features look or work. Liking those features

---

[7] To be fair, recall that, in a previous application, TBL tried and failed to register the wheat-yellow color. But we must focus on the separate application before us, which did not claim the color.

is, of course, good for sales, but it does not establish that the design features in the application acquired secondary meaning, which focuses on source identification.[8]

Are sales numbers themselves ever indicative of secondary meaning in product design cases? Other circuits have deduced that they typically are not "since the product's market success may well be attributable to the desirability of the product configuration rather than the source-designating capacity of the supposedly distinguishing features or combination of features." *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1452 (3d Cir. 1994); *see, e.g.*, *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1148 (10th Cir. 2016) ("Standing alone, sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification." (quoting *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 978 (10th Cir. 2002))); *In re Bongrain Int'l (Am.) Corp.*, 894 F.2d 1316, 1318 (Fed. Cir. 1990) (determining that "[g]rowth in sales" did not prove acquired distinctiveness where it "may indicate the popularity of the product itself rather than recognition of the mark"); *see also* 1 *McCarthy* § 8:8.50 ("[T]o use the volume of sales to serve as evidence to prove secondary meaning in a trade dress, there must be some proof that the sales were generated by the alleged trade dress rather than by factors other than source identification."). Although our court has long listed sales success as one of the relevant factors for assessing secondary meaning of trademarks in general,

---

[8] In addition, customers may have bought the boots because they liked other features that were not part of TBL's application, such as the wheat-yellow color, the tree logo or the lug sole. Or customers may have attributed those unclaimed features to Timberland. Regardless, customer perceptions of the unclaimed aspects of the boot cannot demonstrate that the claimed portions of the boot have acquired secondary meaning.

*U.S. Search*, 300 F.3d at 525 (citing *Perini*, 915 F.2d at 125), when it comes to product designs, we agree with our sister circuits that a product's sales success, considered in a vacuum, typically is less helpful to showing whether the product's design has acquired secondary meaning. That is not to say that sales success should be ignored in product design cases, only that the sales numbers by themselves—without evidence linking them to a product's source designation as opposed to its design—will rarely, if ever, signal the presence or absence of secondary meaning.

Therefore, while the Timberland boot boasts impressive sales, we see no clear error in the district court's determination that the numbers themselves did little to indicate that the claimed features of the boot's design have acquired secondary meaning.

### 4. Unsolicited Media Coverage

TBL's challenge to the district court's analysis concerning media coverage follows the same pattern. The Timberland boot has appeared in various media. As one senior Timberland manager has catalogued, the boots have appeared in television, movies, music and publications. The record also contains reams of Instagram posts of individuals, mostly celebrities, wearing boots that user comments identify as "Timberlands," "Tims" or the like.

Even so, the district court found that these references did little to show that the design features TBL specifically sought to register had acquired secondary meaning. Rather, the district court stressed that these images from media coverage, like the advertisements, included features of the Timberland boot that were not part of its trade dress application. Some images include TBL's registered tree logo burned onto the boot's

side. Also, as the district court observed, most of the images present the boot in its best-selling wheat-yellow color, a feature TBL does not claim in its current application. The district court considered these unclaimed design features to be more distinctive than the design that TBL now wishes to register as trade dress.

True, as TBL argues, the presence of other identifiers is not always fatal to showing a product design's distinctiveness. But their presence can suggest that a producer relies on that other branding rather than just the claimed design to identify itself as the product's maker. *See Aromatique*, 28 F.3d at 872 (concluding that articles were insufficient to support a showing of secondary meaning since they "do not distinguish between the trade dress and Aromatique's other marks"); *see also Gen. Shoe Corp. v. Rosen*, 111 F.2d 95, 99 (4th Cir. 1940) ("It is of course possible that marks may be so completely associated with one another in the minds of the public as not to indicate separately the origin of the goods."). So, the district court did not legally err by considering the role of the unclaimed design features.

In finding the unclaimed design features played a predominant role in identifying the boot, the district court did not need to look far since TBL had already admitted that they do. When previously TBL sought to register the wheat-yellow color as trade dress, TBL officers stated under oath that it was only the boots' color that allowed for their identification as Timberlands. TBL objects that the statements it made in that prior trade dress application "do not give rise to estoppel in subsequent proceedings." Reply Br. at 29 (quoting *Institutional Wholesalers, Inc. v. Saxons Sandwich Shoppes, Inc.*, 170 USPQ 107, 1971 WL 16746, at *2 (TTAB Mar. 29, 1971)). But the district court did not conclude that

25

these prior declarations estopped TBL from asserting in this case that the design it now claims has enjoyed unsolicited media coverage; rather, the district court determined only that the prior sworn statements "undercut" TBL's current position that its boot is identifiable based on features other than its color. *TBL Licensing*, 644 F. Supp. 3d at 201–02. TBL's prior inconsistent declarations to the USPTO are certainly relevant evidence. *See Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1340 (Fed. Cir. 2015); *Freedom Card, Inc. v. JP Morgan Chase & Co.*, 432 F.3d 463, 476 (3d Cir. 2005).

As with TBL's advertising, the media coverage of the Timberland boot does not highlight the aspects of the boot design claimed in TBL's current application. To the contrary, many of the design features TBL described in its application are imperceptible in many of the images contained in the record.

In weighing the media portrayals of the boot, the district court did not legally or clearly err.

### 5. Attempts to Plagiarize

TBL also argues that attempts by others to plagiarize its boot show secondary meaning. And true, attempts to plagiarize a design can evince its distinctiveness. *U.S. Search*, 300 F.3d at 525. But, under the law of secondary meaning, it matters why one imitates. Imitation of design features only to profit from the design's functionality does not establish secondary meaning. Imitation suggests secondary meaning only if it is intended to deceive consumers about the product's source. *See Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 45 (1st Cir. 2001) ("[T]he relevant intent is not just the intent to copy, but to 'pass off' one's goods as those of another."); *Duraco*, 40 F.3d at 1453

("[A]ttempts to copy a product configuration [may] not be probative [because] the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source."); *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 514 (6th Cir. 2013) ("[T]he appropriate 'intent' to focus on is not the intent to *copy* but rather the intent to *deceive* or *confuse*."); *Thomas & Betts*, 65 F.3d at 663 ("Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's."); *Aromatique*, 28 F.3d at 871 (holding that it was clearly erroneous to infer secondary meaning from the copying of a product when the copier conspicuously used its own trademarks to distinguish its products); *Craft Smith, LLC v. EC Design, LLC*, 969 F.3d 1092, 1106 (10th Cir. 2020) ("[W]hen a competitor copies a product's design, its purpose is not necessarily to confuse consumers, but to copy the aspects of that product that make it more functional."); *see also* 2 *McCarthy* § 15:38 ("[E]vidence of copying must be accompanied by evidence that the copier's intent was to confuse customers as to source or sponsorship and was not merely copying to replicate a useful product feature or to join in a market trend."). *But see P & P Imps. LLC v. Johnson Enters., LLC*, 46 F.4th 953, 962 (9th Cir. 2022) ("Though some circuits have adopted . . . an intent to confuse requirement, we have not done so." (internal citation omitted)).[9]

---

[9] In our circuit, a plaintiff in an infringement case triggers a rebuttable presumption of secondary meaning by proving that "the defendant directly and intentionally copied its mark." *Int'l Bancorp*, 329 F.3d at 371; *see also M. Kramer Mfg.*, 783 F.3d at 448 ("[E]vidence of intentional, direct copying establishes a prima facie case of secondary meaning sufficient to shift the burden of persuasion to the defendant on that issue."). But

Here, the district court declined to infer distinctiveness from the existence of boots resembling Timberlands. It concluded that TBL has not provided any evidence showing that its competitors sell similar looking boots intending to trick consumers into thinking their boots are Timberlands. In support of that conclusion, the court noted that TBL has not identified any ruling that competitors have infringed its alleged trade dress.

TBL responds that it persuaded two of its competitors to stop selling similar looking boots. But it never provided written documentation of those supposed enforcement efforts, even after the USPTO requested it. Though TBL asserts that it resolved those matters over the phone without documentation, TBL has not demonstrated that any of its competitors crossed the fine line that distinguishes emulating desirable product features from plagiarizing protected designs to confuse consumers about their source. Since TBL failed to produce evidence of intentional plagiarism, the district court did not clearly err in declining to infer distinctiveness from the mere existence of similar looking boots.

---

even this infringement framework focuses on the copier's intent to confuse consumers about a product's source. *See Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 (4th Cir. 1990) ("When a newcomer to the market copies a competitor's trade dress, its intent must be to benefit from the goodwill of the competitor's customers by getting them to believe that the new product is either the same, or originates from the same source as the product whose trade dress was copied."); *see also Dick's Sporting Goods*, 188 F.3d 501, *9 (finding no evidence of deliberate copying since "the record reveals no evidence that [defendant] intended to palm off the reputation or goodwill of [plaintiff] by employing the trade name"); *Devan Designs, Inc. v. Palliser Furniture Corp.*, 998 F.2d 1008 (4th Cir. 1993) (per curiam) (unpublished table decision) (affirming district court's finding that the presumption was rebutted by showing, among other things, that advertising focused "on the attractiveness of the product rather than its source").

*6. Continuous and Exclusive Use*

Instead, the district court found that the presence of similar looking boots from other manufacturers actually undermined TBL's argument that its claimed design features are distinctive. The last factor suggests secondary meaning only if the continuous use of the design in commerce is also substantially exclusive. *See U.S. Search*, 300 F.3d at 526 n.12 ("Even assuming [plaintiff] has used 'U.S. Search' continuously since 1982 . . . , length of time *alone* is insufficient to establish secondary meaning."); *B & J Enters.*, 329 F. App'x at 419 ("[E]vidence of length of use, absent a showing of exclusivity, is inadequate to satisfy the sixth *Perini* factor."). "The saturation of the market with look-alike boots," to the district court, undercut TBL's assertion of secondary meaning. *TBL Licensing*, 644 F. Supp. 3d at 200. TBL argues that the district court lent too much weight to those lookalikes.

TBL contends that the district court erred by considering competing designs without scrutinizing on a more granular level each design and its relative share of the U.S. boot market. It is true that courts sometimes have considered competitors' minimal market shares to find that their competing marks did not weaken the commercial strength of a senior mark. *See, e.g.*, *Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 452–53 (E.D. Va. 2019) (considering the limited sales and marketing of third-party marks in determining that they did not materially weaken the commercial strength of the plaintiff's mark), *aff'd*, 851 F. App'x 357 (4th Cir. 2021) (per curiam); *Select Auto Imps. Inc. v. Yates Select Auto Sales, LLC*, 195 F. Supp. 3d 818, 833 (E.D. Va. 2016) ("Without evidence as to the extent of actual day-to-day use of [third-party] marks,

29

the probative value of such evidence is minimal."). But we have never required a deep dive into those details. *See, e.g.*, *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 269–71 (4th Cir. 2006) (reasoning that third-party use of similar marks undermined commercial strength, without analyzing market share); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 663–64 (4th Cir. 2018) (same). Nor have other circuit courts when there is evidence of significant third-party use.[10] Even when the record "does not establish the exact

---

[10] *Compare Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1269 (7th Cir. 1989) (determining the distribution of lookalike pamphlets cut against exclusive use despite the record not establishing "the exact extent of the third party use"); *Forney*, 835 F.3d at 1254 (holding that CEO's testimony that Forney was the exclusive user of the trade dress was an insufficient showing of exclusive use to survive summary judgment, especially in light of "several pictures offered by [the defendant] showing product packages in the retail-metalworking sector that bear a close resemblance to Forney's product packaging"); *Juice Generation*, 794 F.3d at 1339 (determining that TTAB failed to adequately account for evidence of "a fair number of third-party uses" of similar marks by discounting the evidence for lack of "specifics regarding the extent of sales or promotional efforts surrounding the third-party marks"); *and Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1373–74 (Fed. Cir. 2015) ("[E]xtensive evidence of third-party use and registrations is 'powerful on its face,' even where the specific extent and impact of the usage has not been established."), *with Scarves by Vera, Inc. v. Todo Imps. Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976) (finding that evidence of third-party registrations was insufficient to weaken a trademark where "[d]efendant introduced no evidence that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers"); *Curtis-Stephens-Embry Co. v. Pro-Tek-Toe Skate Stop Co.*, 199 F.2d 407, 414 (8th Cir. 1952) (finding evidence of third-party trademark registrations insufficient to support a finding of invalidity where the registrations "did not show, and there was no effort made to prove, where they had been used (other than at the place of business), whether they were in use after the dates of the registrations or had been discontinued, or how exclusive their use had been"); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1537 (11th Cir. 1986) ("[T]hird party use of one or more suggestive or arbitrary elements of a plaintiff's trade dress renders that trade dress indistinct only if the third party use is so extensive and so similar to the plaintiff's that it impairs the ability of consumers to use the trade dress of the products to identify their source."); *and L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 1352 (Fed. Cir. 1999) (determining that the district court improperly suggested that "*any* use by others,

extent," widespread third-party use of substantially similar designs suggests the at-issue design lacks secondary meaning. *Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1269 (7th Cir. 1989).

So, while TBL had every right to argue that the lookalike boots were not substantially similar and that their minimal sales did not preclude exclusivity, the district court was entitled to consider the countervailing evidence. And based on our review, the record is replete with pictures of boots marketed and sold in the United States that appear "substantially similar" to the design TBL sought to register, which suffices to prevent TBL from proving it exclusively used that design. *See Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1045 (4th Cir. 1984) (approving of the admission of evidence of "substantially identical" and "substantially similar" designs as "probative of the extent and nature of exclusivity of use"); *Converse, Inc. v. Int'l Trade Comm'n*, 909 F.3d 1110, 1122 (Fed. Cir. 2018) (ruling that evidence of the use of "substantially similar" but not identical trade dress may inform a secondary meaning analysis).

As the party seeking registration, TBL bore the "rigorous" burden of showing secondary meaning, including continuous and exclusive use. *U.S. Search*, 300 F.3d at 525. To find TBL failed to discharge its burden, the district court was not required to assess the market shares of the myriad of lookalike boots. Nor was the district court obligated to run through each boot one-by-one and discuss how it resembled the applied-for TBL design.

---

including an infringing use derived from the originator of the mark, precludes an applicant's 'substantially exclusive' use").

As a result, the district court did not clearly err in finding that TBL came up short of showing its use of the design was substantially exclusive.

To sum up our secondary meaning analysis, TBL had to show that the design features described in its application encourage consumers to buy the boot not because those features make the boot a solid product but because, to the public, those features make the boot a Timberland product. Since this distinctiveness concept is "intuitive" and "heavily fact-dependent," "when a factfinder does make findings on this question . . . , an appellate court will naturally be exceedingly reluctant to rule such findings clearly erroneous." *Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.*, 187 F.3d 363, 377 (4th Cir. 1999). Without a viable consumer survey, TBL lacks direct evidence of secondary meaning. Resorting to circumstantial evidence, TBL has not shown that its sales or advertising expenditures have translated into consumer recognition of the design elements it sought to register. Indeed, portrayals of TBL's boot in marketing materials and the media tend to highlight features not claimed in TBL's current application. The many similar looking products in the boot market do not show that competitors copied TBL's design intending to confuse consumers. Rather, those lookalikes undermine TBL's attempt to show that the design it sought to register has come to be "uniquely associated" with Timberland. *Two Pesos*, 505 U.S. at 766 n.4; *see also Tools USA*, 87 F.3d at 660; *Perini*, 915 F.2d at 125. Assessing these various factors, the district court found that TBL failed to show that the combination of features it specified in its registration application—the outer ankle collar, the two-tone color and etching on the side of the boot's sole, the hourglass rear heel panel, the quad stitching along the boot's side and tongue area, the hexagonal eyelets for the

boot's laces and the boot's bulbous toe box—leads consumers to associate the boot with Timberland alone. Since our review of the record does not leave us with "a definite and firm conviction that a mistake has been made," we conclude that the district court did not clearly err in finding that the design TBL sought to register has not acquired secondary meaning. *Pizzeria Uno Corp.*, 747 F.2d at 1526.

### III.

In conclusion, the district court did not clearly err in finding that TBL failed to carry its burden of proving that the boot design it sought to register has acquired a distinctive meaning. For that reason alone, TBL could not register the design described in its application, regardless of whether or not that design, as a whole, is functional. Accordingly, without deciding the functionality issue, the district court's judgment is

*AFFIRMED*.